UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                              Case No. 8:13-cv-

CONTENTS OF DEUTSCHE BANK
DBFX TRADING ACCOUNT NUMBER
5000002962, HELD IN THE NAME OF
JON HAMMILL,

    Defendant.

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America brings this complaint and alleges upon information and belief as follows:

### NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(1)(C) and Rule G(2), the contents of Deutsche Bank dbFX trading account number 5000002962, held in the name of Jon Hammill (Defendant Funds) on the ground that the Defendant Funds are traceable to the proceeds of mail and wire fraud, committed in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

### JURISDICTION AND VENUE

2.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions

commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

3. This Court has in rem jurisdiction over the Defendant Funds, pursuant to 28 U.S.C. § 1355(b)(1)(A) and (b)(2), because pertinent acts or omissions giving rise to the forfeiture occurred in Tampa, Florida, which is within the Middle District of Florida.

4. Venue is proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in Tampa, Florida, which is within the Middle District of Florida.

## THE DEFENDANT *IN REM*

5. The Defendant Funds are traceable to a multi-million dollar Ponzi scheme perpetrated using the United States Mail and interstate wires. The primary perpetrators of the Ponzi scheme have been criminally convicted for various acts associated with the scheme, but not all of the funds traceable to the scheme have been recovered. The Defendant Funds, approximately $29,046.58, are currently held at Deutsche Bank, Winchester House, 1 Great Winchester Street, London EC2N 2DB, United Kingdom.

## STATUTORY BASIS FOR FORFEITURE

7. Because the Defendant Funds are traceable to the proceeds of mail and wire fraud, committed in violation of 18 U.S.C. §§ 1341 and 1343, they are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Under Section 981(a)(1)(C), the United States is authorized to civilly forfeit any property that constitutes or is derived from proceeds traceable to a "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7). Section 1956(c)(7) defines offenses "specified

unlawful activity," to include offenses listed in 18 U.S.C. § 1961(1), which in turn includes wire and mail fraud offenses in violation of 18 U.S.C. §§ 1341 and 1343.

8. Specific facts supporting the forfeiture of the Defendant Funds are contained in the Affidavit of Postal Inspector Alejandro E. Almaguer of the United States Postal Inspection Service. The affidavit is attached to this complaint as Exhibit A and fully incorporated herein by reference.

9. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Funds are traceable to proceeds of mail and wire fraud.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America requests that this Court initiate a process of forfeiture against the Defendant Funds, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests that the Court

order the Defendant Funds forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: June 27, 2013

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By: /s/ Natalie Hirt Adams
NATALIE HIRT ADAMS
Assistant United States Attorney
USA NO. 141
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6220
E-mail: Natalie.Adams@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Alejandro E. Almaguer, declare under penalty of perjury that:

I am a Postal Inspector with the United States Postal Inspection Service. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and through information conveyed by other law enforcement officers and witnesses.

Executed this 27th day of June 2013.

_____
Alejandro E. Almaguer, Postal Inspector
United States Postal Inspection Service

## AFFIDAVIT

I, ALEJANDRO E. ALMAGUER, declare under penalty of perjury, pursuant to 18 U.S.C. § 1746, that the following is true and correct:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Postal Inspector with the United States Postal Inspection Service (Cincinnati Field Office), and have been employed in that capacity for over nine years. I am a federal law enforcement officer with the authority to execute arrest, search, and seizure warrants issued under the authority of the United States. I am responsible for investigating allegations of fraud and white-collar crime violations, namely mail fraud (in violation of 18 U.S.C. § 1341), wire fraud (in violation of 18 U.S.C. § 1343), and money laundering (in violation of 18 U.S.C. §§ 1956, 1957). I am also a licensed attorney in the State of Ohio and admitted to the United States District Court for the Southern District of Ohio.

2. I have experience investigating large and complex mail, wire, and bank fraud schemes and the attendant money laundering activities associated with those crimes. I also have experience tracing and seizing real and personal property involved in criminal activity and subject to federal forfeiture. I have experience investigating fraudulent investment schemes, including Ponzi schemes wherein the promoters pay purported returns out of the investments of new investors rather than the returns of legitimate investments. The perpetrators of these fraudulent investment schemes typically use false representations and statements to investors to obtain money and property for their own personal gain.

1

## DEFENDANT FUNDS

3.     The "Defendant Funds" are the contents of Deutsche Bank dbFX trading account number 5000002962, held in the name of Jon Hammill. The account is a forex trading account held at Deutsche Bank, Winchester House, 1 Great Winchester Street, London EC2N 2DB, United Kingdom. The current balance in the account is approximately $29,046.58.

## PURPOSE OF AFFIDAVIT

4.     I submit this affidavit in support of the civil in rem complaint against the Defendant Funds. Because of its limited purpose, this affidavit does not contain all of the information known to me regarding this investigation, but only that information sufficient to establish probable cause to believe that the Defendant Funds are criminal proceeds of a Ponzi mail fraud scheme based in the Middle District of Florida and perpetrated in violation of 18 U.S.C. §§ 1341 and 1343, and are therefore subject to forfeiture to the United States.

5.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained by other law enforcement officers,[1] communications with others who have personal knowledge of the events and circumstances described herein (including participants), review of documents and computer records related to this investigation, and my training and experience.

## INVESTIGATION SUMMARY

6.     DAVID LEWALSKI, with the help of JON HAMMILL, conducted a $30

---

[1] In particular, this case was investigated with the assistance of the Florida Attorney General's Office and the Florida Department of Law Enforcement.

million Ponzi scheme through the use of corporate entities, including BOTFLY, LLC (BOTFLY). From BOTFLY's establishment in 2005, continuing through LEWALSKI's arrest in November 2010 and beyond, LEWALSKI and, later, HAMMILL, while residing in the Middle District and other places in Florida, solicited investors and accepted monies from investors in Florida and throughout the United States.

7. LEWALSKI and HAMMILL advanced their scheme using the United States Mail and interstate wires. LEWALSKI and HAMMILL sent and received checks and fraudulent investment statements to and from investors located throughout the country via the United States Mail. LEWALSKI and HAMMILL also sent monthly statements containing false and fraudulent statements via the U.S. Mail and via email and the BOTFLY website, which was hosted in Panama. They distributed fictitious interest payments to their disbursed investors by bank wires and online payments. In addition, LEWALSKI and HAMMILL communicated with BOTFLY's pool of over 500 victim-investors via the Internet using servers located in various states throughout the United States.

8. The scheme successfully targeted hundreds of victims and generated millions of dollars in fraud proceeds for LEWALSKI, HAMMILL, and their companies.

### CONVICTION AND ADMISSIONS OF LEWALSKI

9. On or about April 1, 2010, the Florida Attorney General (FLAG) filed a state civil enforcement action in the Sixth Judicial Circuit of Pasco County: *State of Florida v. Botfly LLC, David R. Lewalski, Jon J. Hammill*, civil number 51-2010-CA-2912-WS/G. The FLAG's Amended Complaint described LEWALSKI and HAMMILL's scheme as "beginning as early as 2005 ... [and as involving] soliciting money from

consumers in Florida and the United States totaling more than $23 million." The Amended Complaint continued, "On information and belief, more than 500 persons and entities have invested in Botfly, and of these investors, more than 200 are Florida residents."

10. On or about April 1, 2010, the Pasco County Circuit Court issued a temporary injunction that, among other things, froze all of the defendants' assets, including BOTFLY's trading accounts at Deutsche Bank and issued a separate order appointing a receiver to take possession of the defendants' assets.

11. Within twenty-four hours after the filing of the FLAG's lawsuit and the freezing of the accounts, LEWALSKI boarded a chartered private jet and flew with his girlfriend to Belgium. LEWALSKI paid for the flight, which cost $172,744, with investor funds. Although LEWALSKI had a return flight scheduled one week later, LEWALSKI and his girlfriend stayed in France and Belgium, for more than six months. During this time, LEWALSKI communicated with investors and co-conspirators in the United States and elsewhere via email, raising funds for trading and his legal defense, garnering support, facilitating the concealment of assets, and otherwise managing his affairs from afar. After six months, LEWALSKI ran out of money and returned to the United States.

12. On or about November 2, 2010, Magistrate Judge Thomas B. McCoun III signed a complaint and arrest warrant for LEWALSKI, charging him with one count of wire fraud.

13. On or about November 4, 2010, Postal Inspectors arrested LEWALSKI in New York, New York on the complaint issued from the Middle District of Florida. LEWALSKI was detained and the case was transferred to this district.

14.     On December 1, 2010, LEWALSKI was indicted for conspiracy to commit mail and wire fraud (one count), mail fraud (one count), and wire fraud (two counts). *See United States v. Lewalski,* Case No. 8:10-CR-501-T-27MAP (M.D. Fla.) Indictment, Doc. 6. On March 30, 2011, the Grand Jury returned a Superseding Indictment against LEWALSKI charging him with mail fraud scheme (one count), and a wire fraud scheme (sixteen counts). *See United States v. Lewalski,* Case No. 8:10-CR-501-T-27MAP (M.D. Fla.), Superseding Indictment, Doc. 49.

15.     LEWALSKI pleaded guilty on July 26, 2011, to the mail fraud scheme, committed in violation 18 U.S.C. § 1341. *Id.*, Plea Agreement, Doc. 77. On November 17, 2011, LEWALSKI was sentenced to twenty years in prison, was ordered to forfeit approximately $30 million, as well as several specific assets, to the United States, and was ordered to pay approximately $19 million in restitution. *See id.*, Judgment, Doc. 96.

16.     LEWALSKI has corroborated and admitted to the details of the BOTFLY Ponzi scheme in proffer sessions with the United States and in his Plea Agreement. He received no sentencing credit for these proffers. In addition to other facts, LEWALSKI described the source and transfers of the criminal proceeds, including the transfer of criminal proceeds to HAMMILL by way of "salary" or "commissions". LEWALSKI's specific admissions were as follows:

17.     BOTFLY, LLC was a Florida limited liability company incorporated on or about September 13, 2005. BOTFLY's principal office address was listed as 12709 Clocktower Parkway, Bayonet Point, FL 34667, which is the residence of LEWALSKI's mother, and is located in the Middle District of Florida. BOTFLY's organizational

documents list DAVID LEWALSKI as its manager and registered agent.

18. LEWALSKI, in complicity with HAMMILL and others, engaged in a Ponzi scheme wherein they told investors that through foreign currency trading ("forex"), they could generate returns of as much as 285% per year. LEWALSKI and HAMMILL made materially false statements and misrepresentations to investors that, in addition to the fact that the investors would earn 10% returns, compounded monthly, that their investment was secure and that they could withdraw their funds at any time. In reality, LEWALSKI and HAMMILL invested very little investor money in the forex market, made no profits through foreign currency trading, had no other source of income other than investor funds and paid investor returns with other investors' money. LEWALSKI also lavishly spent investor funds on himself and gave investor money to his girlfriend, friends, and relatives.

19. LEWALSKI's fraudulent activity and false statements about trading investor money in the forex market preceded his establishment of BOTFLY and his targeting of victims in Florida. In or around 2004, LEWALSKI began soliciting investors in Arizona, where he was living at the time, and promised to invest their money in the forex market. Initially, LEWALSKI solicited investors under the company name Forex Capital Development, Inc. LEWALSKI started with a small group of investors, promising to pay them 10% monthly returns on their investments. In or around 2006, LEWALSKI began giving excuses to these investors as to why he could not return their money. LEWALKSI then ceased all communication with these investors.

20. During this same time, LEWALSKI relocated to Florida, established BOTFLY, and engaged in the same or similar scheme to defraud. Beginning in or

6

around 2006, LEWALSKI started attracting new investors, most of whom resided in Florida. In or around 2008, LEWALSKI was joined by HAMMILL, a car salesman who resided in the Middle District of Florida. In solicitations or welcome emails, LEWALSKI and HAMMILL explained their supposed investment program to the investors by stating:

> *We borrow your money from you and pay a monthly interest of 10%. Most people like to have the interest added in and then it compounds each month. It creates incredible growth rates ($25k will compound to $78460 in 12 months, it takes 25 months to go from $100k to $1 mil). How we do it is on the foreign exchange market….*

21. LEWALSKI and HAMMILL used a website, www.Botflyllc.com, starting in or around 2009, to communicate with investors. They placed the website with a company in Panama in an attempt to evade law enforcement. Investors obtained a log-on and password to access the website. The website was programmed to show a 10% increase to each investor's "balance" per month, when in fact the balances and interest earned were fictitious.

### CONVICTION AND ADMISSIONS OF HAMMILL

22. In March 2011, the United States charged HAMMILL with concealing, during his petition for bankruptcy, that he had personally received $111,000 from BOTFLY prior to filing for bankruptcy, and that he owned and controlled Jon J. Hammill, P.A., a shell company that received approximately $1.5 million from BOTFLY in total.[2] *See United States v. Hammill*, case 8:11-cr-00180-RAL-EAJ, Indictment, Doc. 1.[3]

---

[2] BOTFLY paid the additional money to Jon J. Hammill, P.A. after Hammill filed his petition for bankruptcy.
[3] HAMMILL refused the government's requests for critical documents and information regarding BOTFLY's operations until around the time of his sentencing and after which

7

23. HAMMILL pled guilty to one count of bankruptcy fraud, committed in violation of 18 U.S.C. § 152(2). *See id.*, Plea Agreement, Doc. 41. In his Plea Agreement, HAMMILL admitted that he invested in and worked for BOTFLY as its founder/operator and that BOTFLY paid him and Jon J. Hammill, P.A, his wholly-owned and controlled shell company, $10,000 per month, plus up to 10% of the principal invested by new investors he brought in to BOTFLY. *Id.*, pp. 14-15. He further admitted that:

> *When Hammill filed for bankruptcy on or about February 10, 2009, he failed to disclose on his petition or during the meeting of the creditors that occurred on or about March 17, 2009, that he had an investment in Botfly, worked for Botfly, or received a salary and commissions from Botfly. On or about the same date the defendant filed for bankruptcy, he arranged for his payments from Botfly to be directed to his nominee shell company, Jon J. Hammill, P.A., in order to conceal his income. He failed to report on his bankruptcy petition or attached schedules that Jon J. Hammill P.A. was operational or that it had received and expected to receive salary, commissions and other funds from Botfly. Hammill made these false statements and material omissions knowingly and with the intent to obstruct, impede or otherwise influence the bankruptcy process.*

24. On October 21, 2011, HAMMILL was sentenced to 30 months in prison. HAMMILL is currently serving his sentence at the Federal Prison Camp in Pensacola, Florida.

## TRACING DEFENDANT FUNDS

25. The BOTFLY Ponzi scheme generated approximately $30 million in

---

time the government had expended significant resources in gathering the information from other resources.

investors' funds.[4] As admitted by LEWALSKI and corroborated by the investigation, his sole source of income was investors' funds.

26. Financial analysis of banking records found the following:[5]

a. Approximately $15 million in BOTFLY's investor funds was paid out to investors, who were falsely told that the funds represented monies earned from LEWALSKI's trading activities. A large portion of this money was also paid out in commissions to HAMMILL and others who referred new investors.

b. Approximately $10 million in investor funds was misappropriated and distributed to and/or spent by LEWALSKI, HAMMILL, their co-conspirators.

c. Approximately $4 million in investor funds was deposited in various domestic and foreign bank and trading accounts formerly controlled by LEWALSKI and/or HAMMILL, were frozen or seized by the State of Florida.

d. Approximately $1.55 million of investor funds was transferred from domestic accounts controlled by LEWALSKI to one or more bank or trading accounts held by UBS in Switzerland. All the trading in these accounts resulted in losses.

e. Approximately $1.8 million in investor funds was transferred from domestic accounts controlled by LEWALSKI to four Deutsche Bank trading accounts in the United Kingdom established in the names of BOTFLY, LEWALSKI, and HAMMILL.

27. The last category includes the Defendant Funds.

28. The main initial investor depository account for BOTFLY was Bank of America account number 0036-7015-5586, held in the name of "BOTFLY L.L.C.," (BOTFLY Depository Account) into which over $28 million in investor funds was deposited. This account never contained any funds other than investor funds.

---

[4] With HAMMILL's assistance, BOTFLY grew from a $5 million Ponzi scheme to a $30 million Ponzi scheme.
[5] The categories are not mutually exclusive and, thus, the total of the separate

Throughout the Ponzi scheme LEWALSKI transferred over $7.4 million out of the BOTFLY Depository Account into Bank of America account number 8980-2441-7098, held in the name of "BOTFLY L.L.C." (BOTFLY L.L.C. Account) Like the BOTFLY Depository Account, the BOTFLY L.L.C. Account never contained funds other than investor funds.

29. From about October 1, 2008 to about January 31, 2009, Wachovia Bank checking account number 200002725-5195 held in the name of the "JON J HAMMILL, P.A. JON HAMMILL" (HAMMILL Wachovia Account) maintained a balance of less than $38.00.

30. Between February 11, 2009 and March 25, 2010, approximately $1,437,001.50 was transferred from the BOTFLY Depository and L.L.C. accounts into the HAMMILL Wachovia Account. During this time, there were no other legitimate sources of deposits into the HAMMILL Wachovia Account.

31. Around this same time period, HAMMILL also had a Bank of America (BOA) account: account number 00376875-5458, held in the name of "JON J HAMMILL" (HAMMILL BOA Account). On March 24, 2009, the HAMMILL BOA Account contained $211.45. Beginning on March 25, 2009, HAMMILL began transferring Ponzi funds into the HAMMILL BOA Account. Between March 25, 2009 and February 26, 2010, HAMMILL transferred approximately $607,566.19 in Ponzi funds from the HAMMILL Wachovia Account into the HAMMILL BOA Account.

32. On or about July 15, 2008, HAMMILL set up his personal offshore trading account at Deutsche Bank AG, account number 500000-2962 in the name "Hammill J.

---

categories is larger than the $30 million estimate.

Jon," (HAMMILL DB Account). This is the account that currently contained the Defendant Funds. HAMMILL opened the account with several deposits totaling $28,500, of which at least $26,000 was funded by investor funds withdrawn from HAMMILL's BOTFLY investment account. The investigation revealed that, as in all classic Ponzi schemes, these interest payments or draws from HAMMILL's investment accounts were taken from funds provided by other investors.

33. On or about October 22, 2008, HAMMILL lost all the money in the HAMMILL DB account, except for $1,800, which he withdrew. HAMMILL left approximately $138.06 in the HAMMILL DB account to keep the account open for future use.

34. After HAMMILL joined LEWALSKI and BOTFLY, he began wiring additional funds into the HAMMILL DB account. From March 2009 until about March 2010, HAMMILL wired $255,000 from the HAMMILL BOA account into the HAMMILL DB account in the following transactions:

| TRANSACTION | DATE | AMOUNT |
| --- | --- | --- |
| 1 | 3/11/2009 | $10,000 |
| 2 | 04/10/2009 | $10,000 |
| 3 | 08/14/2009 | $18,000 |
| 4 | 10/07/2009 | $30,000 |
| 5 | 10/29/2009 | $20,000 |
| 6 | 11/17/2009 | $50,000 |
| 7 | 11/30/2009 | $20,000 |

| 8 | 01/06/2010 | $48,000 |
| 9 | 03/02/2010 | $49,000 |

35. Although the HAMMILL BOA Account received some other deposits during the time it received BOTFLY Ponzi deposits, the money wired from the HAMMILL BOA Account into the HAMMILL DB Account is traceable to the BOTFLY Ponzi scheme. This is because Ponzi funds were deposited into the HAMMILL BOA Account just before the wires were made into the HAMMILL DB Account, with no intervening deposits.

36. On or about March 11, 2009, HAMMILL deposited $10,000 in cash into HAMMILL BOA Account and wires $10,000 from the HAMMILL BOA Account to the HAMMILL DB Account. HAMMILL's only known source of significant income at the time he made the deposit was BOTFLY. *See* Transaction 1 above.

37. On or about March 25, 2009, HAMMILL transferred $15,000 from the HAMMILL Wachovia Account into the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between March 23, 2009 and April 1, 2009. On or about April 1, 2009, HAMMILL wired $10,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. *See* Transaction 2 above.

38. On or about August 12, 2009, HAMMILL transferred $29,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between August 12, 2009 and August 14, 2009. On or about August 14, 2009, HAMMILL wired $18,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. *See* Transaction 3 above.

39. On or about October 6, 2009, HAMMILL transferred $49,500 from the HAMMILL Wachovia Account into the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between October 6, 2009 and October 7, 2009. On or about October 7, 2009, HAMMILL wired $30,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. See Transaction 4 above.

40. On or about October 29, 2009, HAMMILL transferred $20,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. On or about October 29, 2009, HAMMILL wired $20,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. See Transaction 5 above.

41. On or about November 16, 2009, HAMMILL transferred $100,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between November 16, 2009 and November 17, 2009. On or about November 17, 2009, HAMMILL wired $50,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. See Transaction 6 above.

42. On or about November 16, 2009, HAMMILL transferred $100,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between November 16, 2009 and November 30, 2009. On or about November 30, 2009, HAMMILL wired $20,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. See Transaction 7 above.

43. On or about January 5, 2010, HAMMILL transferred $50,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. No other deposits were made to the HAMMILL BOA Account between January 5, 2010 and January 6, 2010. On or about January 6, 2010, HAMMILL wired $48,000 out of the HAMMILL BOA

Account into the HAMMILL DB Account. *See* Transaction 8 above.

44. On or about February 26, 2010, HAMMILL transferred $50,000 from the HAMMILL Wachovia Account to the HAMMILL BOA Account. No other deposits were made into the HAMMILL BOA Account between February 26, 2010 and March 2, 2010. On or about March 2, 2010, HAMMILL wired $49,000 out of the HAMMILL BOA Account into the HAMMILL DB Account. *See* Transaction 9 above.

45. As demonstrated above, using the LIFO accounting principle, all the money deposited in the HAMMILL DB Account was derived from the BOTFLY's Ponzi proceeds. HAMMILL lost over a quarter of a million dollars ($250,000) once-contained in the HAMMILL DB Account by trading on the foreign currency exchange market. By April 2010, the HAMMILL DB Account had a balance of only $29,046.58. These remaining funds are the Defendant Funds that the government now seeks to forfeit.

## CONCLUSION

46. The foregoing facts establish probable cause to believe that the Defendant Funds are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), because they are traceable to the proceeds of mail fraud, committed in violation of 18 U.S.C. § 1341 and wire fraud, committed in violation of 18 U.S.C. § 1343.

This completed my affidavit.

Executed this 27 day of June, 2013 by:

_____
Alejandro E. Almaguer, U.S. Postal Inspector
United States Postal Inspection Service

14